HONE vs. KENT, executor, &c.

A will is to be interpreted by the intention as gathered from the whole of its provisions; and not by the meaning of words, that would result from their derivation.

A testator, by the sixth clause of his will, gave to his son, (who was also the sole executor,) his " Commentaries on American Law," four volumes, with the right of renewal of all previous and future editions, according to law, and all other rights and privileges appertaining to the copyright, and to so much of the then existing edition [the fifth] as might remain unsold at his (the testator's) death. But he thereby charged upon this bequest of the copyright, one moiety of the net proceeds arising after his death, from the sales of the work, to be held by his son, and his son's representatives, during the existence of the copyright, in trust, for the sole use and benefit of the testator's two daughters, E. H., (the plaintiff,) and M. S., and their respective lawful representatives; the one-fourth part of such net proceeds and profits to be paid to each. In the eighth clause of his will, the testator gave all the residue of his estate, real and personal, specifying as part of it, " *unsold Commentaries on hand*," (subject always to the life estate of his wife,) as follows, viz.: First, one equal undivided third part to his son, his heirs, &c. Second, one other equal undivided third part to his son, in trust for the sole and separate use of E. H., during the joint lives of herself and her husband; and in case of her surviving her husband, then the principal and interest to be transferred to her; in case her husband should survive her, the principal, &c. thereof, remaining unpaid to her, to be transferred to her lawful issue, &c. Third, one other equal undivided third part, (being the remaining portion of his residuary estate,) to his son, in trust, for the sole and separate use of M. S. The testator died on the 12th of December, 1847. All the copies of the 5th edition of the Commentaries were sold previous to his death. In November, 1847, the printing of the 6th edition was commenced, and parts of the 1st, 2d and 4th volumes, (but no part of the 3d volume,) were printed before the testator's death. The printing was continued by the executor after the death

Hone *v.* Kent.

of the testator, and the work was published and the copyright taken out
by him, in the spring of 1848. *Held*, that E. H., (the plaintiff,) did not
take the one-fourth part of the net proceeds of the sixth edition, by virtue
of the sixth clause of the will; but that those proceeds passed to the re-
siduary legatees, under the eighth clause of the will.

THIS was an appeal by the defendant, William Kent, from
the whole of the judgment entered on the report of the referee
appointed in this case. The plaintiff, Eliza Hone, wife of Isaac
S. Hone, by her next friend, Frederick Anthon, filed her com-
plaint against William Kent, executor of the last will and tes-
tament of James Kent, deceased, praying that the executor
might come to an account with her, of the one equal fourth part
of the net proceeds of the sixth edition of the testator's work,
entitled "Commentaries on American Law," to which she
claimed to be entitled, according to the sixth item of said will.
All others interested in the will were made parties defendants,
and put in their respective answers. The bill set out the will
*in extenso*, but all the portions of it material in the decision
of the questions involved in this action are sufficiently stated
in the opinion of the court. The death of the testator on the
12th of December, 1847, after having made his will, and leav-
ing the same in full force, uncanceled and unrevoked, was stated
in the bill. The answer of the defendant, William Kent, the
executor, admitted the making of the will, and the death of the
testator afterwards, leaving the will uncanceled and unrevoked,
as stated in the bill; but claimed, that the surplus proceeds of
the said sixth edition of said Commentaries, were, as he was
advised, to be disposed of according to the provisions of the
eighth, instead of the sixth clause of said will. The cause
was, by consent of parties, referred to a sole referee, who re-
ported that the plaintiff was entitled to an immediate payment
of one-fourth of the net proceeds of the sales of the sixth edi-
tion of Kent's Commentaries, according to the provisions of
the will set forth in the complaint in the cause, and that the
defendant, William Kent, should account for and pay over to
the plaintiff, such her one-fourth part of said proceeds, viz.
the sum of $767,19; and the one-fourth part of all such profits

as should thereafter accrue from the said sixth edition. And that the defendant, Mary Kent Stone, was entitled to recover in like manner. And that none of the parties to the action were entitled to costs, as against any other party thereto.

*C. O'Conor,* for the appellant. The plaintiffs claim that the partially executed edition of the Commentaries, upon which Chancellor Kent was engaged at the time of his death, and which had not been completed or published, passed under the sixth clause of his will. The executor, acting in opposition to his own interest, but in defense of the rights of infants entitled in remainder, is advised to resist the action. He is advised, and therefore insists, that this unfinished and unpublished edition formed part of the goods and chattels of the testator at his death, and that as such it came to him as executor, with the power and duty of completing it so as to fit it for sale; and of treating the proceeds of such sale as part of the testator's residuary estate, to be disposed of under the eighth clause of the will. All that passes under the sixth clause is divisible into three parts, one half to William Kent, and one quarter to each of his sisters. All that passes by the eighth clause is subject to a life estate in the testator's widow, the capital going in three equal shares; *but with remainders to issue limited upon the shares of the daughters.* Mrs. Kent, the widow, having assented to the prayer of the plaintiffs' bill, there could be no controversy, but for these remainders. The question then is, what passed by those clauses, *i. e.* the sixth and eighth respectively. And on this point, there is no dispute, save in respect to the sixth edition, being that upon which, as before stated, the testator was engaged at his death. The primary object of the testator, as expressed by himself, was to provide for his widow, " to leave her during the remainder of her life as completely independent in her income as" he himself was. To this object he devotes the subject of his first gift, embracing in terms all his estate. A strongly worded exception in the last or residuary clause, shows his steady adherence to it. He certainly intended her to have " the possession and use of all his estate,

real and personal, during her natural life," except what is expressly given to others. And, among the things so to be devoted to her use, and for this purpose enumerated in the eighth clause, are his "unsold Commentaries." To defeat in any degree the intent thus clearly manifested, there must be clear and strong words. We will now look to the sixth clause, and see whether it gives these partially completed books to the children. That clause is a gift of the copyright or the incorporeal right of multiplying copies, so far as that right might have any valid legal existence as property, either under the existing acts of congress, or otherwise. Its whole tenor shows this. He calls it "this bequest of the copyright of my Commentaries." Without attempting to dispute that this is the bequest, a narrow and technical argument has been advanced, to carry into the bequest of the copyright a portion of the goods and chattels of the testator, left at his death, as a sort of incident to the gift of the copyright. It has been sustained to the whole extent by the referee : and it is respectfully submitted, that his conclusion is erroneous. The argument in support of it seems shortly to be this : that an *edition*, as that phrase is used by the testator, means a perfected work, which had been *published* at his death. We have not heard *from counsel* how the argument would deal with an edition, of which three volumes had actually been published and extensively sold, and of which the last volume was in the binder's hands, only requiring to be lettered. We know how the *referee* would apply it. The essential basis of this argument is, that inasmuch as the whole copyright was given by the sixth clause, the beneficiaries under the eighth clause could not have a right to complete and sell any books in their hands ; for that would be an infringement of the copyright. We will endeavor to show that there is no soundness either in the verbal criticism on the word *edition*, or in the legal criticism which has generated an imaginary conflict between the sixth and eighth clauses upon our reading of them. The testator was the father of equity in America, deeply learned in every department of legal science, and for half a century an approved expounder of the import of statutes, of the ancient dicta of the common

Hone *v.* Kent.

law, and of every class of public and private documents. It would indeed be strange, if his own last will and testament, drawn by his own hand, and most deeply engaging, as on its face appears, his tenderest affections, should be obscure or doubtful. We think it is not so. If to the general intent—which is always to be preferred—and to the particular wording, which must be supposed to have received profound attention, we give due heed, the construction will be easy. It is most manifest, that the testator did not intend the gift in the sixth clause, to interfere with the income to be derived by his widow during life from his whole estate. He might have left, at his death, a very large, completed, perfected, and *published* edition of the Commentaries, sufficient to supply the market for many years. Did he intend to erect, instantly upon his death, a rival interest in the copyright, which, by a new and cheaper edition, could drive from the market and render comparatively worthless, the "*unsold Commentaries,*" given under the eighth clause, for his widow's benefit during life? The learned referee not only supposes that he did so intend, but also that the identical copies on hand of all such Commentaries, *i. e.* the whole unsold portion of the last edition actually published by the testator in his lifetime, also passed under the sixth clause. If it did so pass, it passed without requiring from the legatees any contribution toward its cost. We do not purpose to devote ourselves to the inquiry, whether the will is so constructed as to confine the authority to renew "*previous editions,*" or "the existing edition," and publish "*future editions,*" so as to prevent this rivalry, which might interfere with the widow's interest in the "unsold Commentaries." We think it very manifest, that the words employed do work this effect. We only refer to this view of the matter, to show how steadily the testator kept in view, and how cautiously he protected, the primary object of his testament, *i. e.* the securing of ease and competency to the surviving partner of his long, virtuous, and honorable life. The very wording of the sixth clause itself, directly refutes the position advanced by the plaintiffs, that an *edition* means an edition *published;* and of the position of the referee, that any

books, or goods or chattels, were intended to pass under it.
It contains its own glossary. Every word in it that could re-
quire interpretation, is interpreted. No room is left to hesi-
tate as to its meaning. The testator describes the whole clause
as "a bequest of the copyright." He gives, not the "*existing
edition*" itself; but, in connection with the subject of copy-
right, he gives "the *rights* and *privileges appertaining* to so
much of the then existing edition, as may remain unsold at his
death." It is a familiar maxim, that things "appertaining,
pass by a gift of the principal thing, as incident thereto." But
here, it is contended that we have a gift of the thing "*apper-
taining*," made to carry its principal with it. The ancient
maxim is reversed, and the principal now follows the incident.
The man pursues his shadow. Let us return to the testator's
words. He contradistinguishes, by apt words of discrimination,
the only three kinds of editions that appear in the case. He
speaks of "*previous editions*," a "*then existing edition*," and
"*future editions.*" It will be noticed that *then* refers to the
time of his death, and not to the date of his will. The idea
that to constitute an edition, a publication is necessary, is com-
pletely repelled by these discriminations. If publication was
the crowning work which constituted an *edition*, nothing could
be an edition which was *not* published; and every thing would
be an edition which *was* published. *All editions* would then be
*previous* or *future*. But the testator speaks of a third kind
of edition, not embraced by either of those terms, *i. e.* an *exist-
ing* edition. What does this import? He speaks as an author
who had already prepared many editions; who might prepare or
be engaged upon another edition at the time of his death; and
who, well knowing the great value and high reputation of his
work, contemplated *future* editions to be edited by his son,
after he had filled an honored grave. The mere incorporeal
right of multiplying copies in respect of all these, he gave to
his son; and he charged upon "*this bequest of the copyright*"
as a deduction, "*all expenses of printing and publishing fu-
ture editions.*" He gives his son "exclusive control, in his dis-
cretion, *of the copyright, and* of the *future* editions thereof,

Hone *v.* Kent.

and of the corrections, improvements or additions to be from time to time made to the Commentaries ;" and as a compensation for these services " *in respect to the same,*" *i. e.* not only in respect to the future editions, but in respect to the Commentaries as an entirety, he gives his son " the remaining moiety or half part of the net profits of the *future* editions. The sisters take the other half between them. The edition *existing* at the testator's death remains untouched by all these dispositions. If any labor devolved on Mr. William Kent to perfect that edition for sale, it was charged upon him by the bequest, and his share of the profits of *future* editions is his compensation. It is plainly so expressed. But it has been said that a gift of the copyright to the beneficiaries, under the sixth clause, would be inconsistent with a right in the beneficiaries under the eighth clause, to have the existing edition completed and published for their benefit. This argument goes too far; it would defeat their right to convert into money the unsold " Commentaries," expressly bequeathed in the eighth clause. But to this idea there are many answers : First, the donee of the copyright is both executor of the will, and legatee in this behalf ; and the thing given *to the beneficiaries* under the sixth clause, is the *profits* of the future editions, not the copyright itself. Secondly, the rules of law require all parts of a will to be taken together, and each to qualify the other, so as to make the whole harmonize, if practicable—which is very easy in this case. And, thirdly, if there was a conflict, the last intent would prevail ; and that is the gift of the " unsold Commentaries" in the eighth clause. Cases may be supposed, where either construction would seem incongruous in practice. If the testator had devoted years of time and labor to an edition, and had it in every respect completed except publication, or, say a small part of the binding ; that edition, to the great detriment of his widow, and palpably against his own intentions, would pass under the sixth clause, if the plaintiffs are right. Again, it may be said, that upon the defendant's reasoning, one note, written by the testator for another edition, would make *it* the *existing* edition. An argument may always be perplexed by extreme cases like these.

They scarcely ever arise in actual life; the good sense of parties subscribes to the rule of law, "*de minimis non curat lex.*" In the present case, the court must view an author who was always engaged upon a present, or existing *edition ;* that edition he contemplated as a different subject from completed editions, and editions thereafter to be begun. Any edition, which he had so far progressed in as to give it a potential, though in some sense inchoate existence—which, as it stood, in its incomplete condition, was valuable property, constituting part of his stock of goods and chattels,—he intended should pass, like the rest of his goods and chattels, under the residuary clause in his will. No gift which he may have made of the *profits* of *future* editions, can ever interfere with or disturb this bequest.

*John Anthon,* for the respondent. The plaintiff contends that the testator, in his last will and testament, must be considered as using English words in their proper acceptation, and technical terms, according to their legal effect. That, in this view, when he speaks of an *edition* of a work, especially in connection with the copyright, he means a work duly issued, and made public according to law. When he speaks of "*unsold volumes,*" he means completed volumes ready for sale, and that this view and interpretation is strengthened and made conclusive, when he speaks of the same volumes as "*on hand.*" The plaintiff also insists that by "*existing edition,*" he means one which has been duly published as aforesaid, and then actually for sale, which would become a "*previous edition,*" when exhausted by sales; and its place supplied by a "*future edition*" and successor. It seems to the plaintiff that this glossary does not require too much from the eminent testator, when, in the law, as much would be attached to the testamentary words of any common person.

The plaintiff also insists, that the testator must be considered as fully understanding the legal effect and bearing on existing rights of a bequest of "the copyright of a book," and inasmuch as such bequest would necessarily become perfect by the death of the testator, he must be especially considered as understand-

ing that it would be at the option of the owner of the copyright, *at what time* a new or future edition should appear, or whether it should appear at all; and also that he well understood that in the law there could be no difference in this particular, whether the title to the copyright was in the executor as a gift, or in a third person. It is presumed that if these matters are conceded, which the law, as well as a due respect for the memory of the deceased, seems to require, there can be no difficulty in interpreting the provisions of his will, without involving it by suppositions in any of the extravagancies hinted at by the appellant's counsel, as connected with the *imperfect* progress at his decease, of a *future intended* edition.

Another preliminary matter meets us at this stage of the case, which the counsel for the appellant seems to think exercises considerable influence over the provisions of the will. He says the primary object of the testator, as expressed by himself, was to provide for his widow; we do not think so. On the contrary, while on the one hand, he was clearly anxious to consult her comfort, he was equally desirous to promote and advance the *immediate* interests of his children, for it will be seen that so soon as he announces the one intention, he proceeds immediately to make specific devises and bequests of important parts of his estate for the *immediate* benefit of his children; which devises and bequests are recognized and fully sustained in the eighth item, on which the present controversy turns. His wife and children were equally dear to him, and this equality of affection is the equity which pervades the instrument.

Having premised these matters, we are ready to approach the question in this cause, which is simply, who is entitled to the edition of the commentaries *published after* the decease of the testator, under the *authority* of William Kent, the then *owner* of the copyright ? The learned and experienced gentleman to whom this cause was referred, decided: (1.) That the contract made by the testator for the publishing of the sixth edition of the commentaries, and the partial printing of the volumes during his lifetime, did not amount to a publication of that edition; that such a publication did not take place until after the decease of

the testator, and under and by virtue of the copyright vested by the deceased, in William Kent. (2.) That the sixth edition of the commentaries published by William Kent after the decease of the testator, falls under the sixth item of the testator's will, and the proceeds are to be distributed accordingly. (3.) That Elizabeth Kent took no interest whatever under said will in the said sixth edition, so published after the decease of the testator. The effect of this decision is to advance the *present* interests of the children of the testator, by giving them the immediate enjoyment of the proceeds of the edition, in the proportions fixed by the testator in the sixth item ; a result most manifestly in accordance with his views, and very strongly upheld by the release of all right on the part of his widow, to any part of this interest, thus admitted by her to be so obviously in the right channel. A contrary determination would be a practical destruction of all essential present benefit, and would be productive of a very doubtful and remote advantage to children and to grandchildren. The effect would be to cause the executors to *isolate* this sixth edition, to *invest* the *proceeds*, and divide the accruing interest, (amounting to some two or three hundred dollars,) among four parties for their lives, remainder among an unknown number of grandchildren, each share or remainder thus finally becoming a valueless pittance. This was not the testator's intention, nor is it in the spirit of his will. It is admitted, nevertheless, that if upon examination it shall be discovered that the law sternly requires this interpretation, the children of the testator must yield to it ; however absurd, as a benefit, the result would be, and however hostile to his well known intentions. With this preface, let us examine and see if there is any thing in the question raised. The condition of the testator's property at the time this will was published, will, in many particulars, indicate his meaning in the use of words ; and this is legally and properly resorted to in cases of doubt, to aid such interpretation. Now it appears in this case, that at the time of the publication of this will, the *fifth* edition had been *duly published* by the learned author, and there were copies of *that edition* in his hands *unsold.* It is therefore natural that at the time he wrote

this will, this condition of his property should be uppermost in his mind, connected, perhaps, with the idea of continued life, and possible future editions. Consequently, the phrases then used by him to describe this particular species of property, were used in their proper acceptation, with reference to the then present state of things, and the possible future, and could not have been misunderstood, had his will gone into immediate effect. The changes from lapse of time create the doubt, so far as a doubt exists, and lead to present controversy. What then were these changes? The testator lived some years after the making of this will, and at the time of his death, the fifth edition, existing, and to which he clearly referred when he made his will, had been disposed of, and preparations were making to publish the sixth, of which, however, none of the volumes were "*printed, published*," or "*on hand*" for sale. Both of these conditions affect the interpretation of this will, and exert an influence over it. Now, then, on the subject under consideration, it is to be remarked that there are two clauses or items which would have been manifestly in conflict, had any of the commentaries remained *on hand unsold*, at the time of the testator's death, viz. the sixth and the eighth items. In the sixth he bequeaths to his son William, "*so much of the then existing edition as may remain unsold at his death*," and in the eighth, having enumerated the residue of his property, and included as part of it, "*unsold commentaries on hand*," he again bequeaths the one-*third* of such residuary property to the same person, his son William, and the residue to others. Now, if words are taken in their ordinary acceptation, this conflict becomes quite unimportant, because at the time of the testator's decease, there was no aliment for either bequest, the fifth edition existing and on hand when the will was made, being exhausted, and the sixth edition not in existence.

It is contended, however, by the appellant's counsel: (1.) That the eighth item contains the last expression of the testator's intention, and supersedes the sixth. (2.) That the words "unsold commentaries on hand," in that item, would embrace an *inchoate edition*, with a *potential* existence. (3.) That the law would compel William Kent, because he is executor of the will, as well

as legatee of the copyright of the commentaries, to give such edition a legal existence by publication, for the purposes of the will. In this way a new state of things would be created after the decease of the testator, and a will made for him, which he most manifestly never contemplated. This, nevertheless, so far as it is intelligible, seems to be the burthen of the appellant's argument; but he cites no case to show that any court of law or equity ever took so decisive a step as he recommends in the present instance, to produce a result so clearly in opposition to the language of a testator, and in effect, to make a testament for him. The entire argument too, it is worthy of remark, proceeds on the *admission* of the non-existence of any new edition at the time of the testator's death, or of any volumes ready for sale, and rests on a metaphysical assumption of a potential existence of an edition. When such potential existence may be said to commence, whether when the idea is first conceived in the editor's mind, or upon penning the first note, or when the work has progressed to an unlettered fourth volume, we are not informed by the appellant's counsel, and are most certainly without any aid in the law. This would suffice to dispose of this nicety, even if unincumbered with the great and insurmountable objection of an assumed power of compelling the owner of a copyright, to make use of his property against his will, for the benefit of others, by some forced inference of duty entirely unexpressed by the testator. I must confess myself at a loss to understand how the law would or could deal with such a case, or what learned annotations would be the result of such legal coercion. I believe the court will agree with the respondent, that none of these refinements were at all in the mind of the enlightened testator, and that the origin as well as the entire foundation of the learned theory of the appellant's counsel is to be found in a mere *oversight* of the testator. He had plainly bequeathed all copies of the commentaries on hand at the time of his death, to his son, by the sixth item; the insertion, therefore, of the words "unsold commentaries," in the subsequent *enumeration* of the *residue* of his *personal property*, was a mere casual slip or inadvertence, which might naturally enough happen in copying in such state-

ment in a residuary clause. " *Debile fundamentum fallit opus*," would seem then to be the maxim disposing of the entire theory of the appellant, resting on such a basis. To return, however, from these mere visions of the appellant, and close the subject rationally; we conclude that taking the language of the will, according to its common acceptation, as our guide, the testator has bequeathed to William Kent the absolute and unqualified copyright in all future editions of his commentaries, and that this necessarily embraces all publications of the work after the death of the testator, which would require the sanction of the owner of the copyright. That nothing short of such *publication* can create an *edition* which from its very Latin root, implies publication, and which, without publication, has no existence. This plain view of the subject, we think, seems most consistent with the testator's parental feelings in behalf of his children, inasmuch as it produces to them the greatest benefit, and the more so as it relieves the case from all the supposed difficulties attending inchoate and potential existences, and all the absurdities growing out of imperfect progress at the time of the testator's death, in any contemplated edition, alien to the frame of the testator's mind. The whole will thus becomes like the testator himself, a plain, unostentatious and simple act; while the view taken by the appellant, would make it unnecessarily subtle, metaphysical, and refined, overlaying obvious intention with difficulties, and defeating kind intentions most manifestly expressed. We therefore trust that the views and decree of the referee will be affirmed.

*B. D. Silliman*, for James K. Stone and the other infant defendants, submitted their rights and interests upon the same points as those relied upon by the defendant William Kent.

*By the Court*, MITCHELL, J. Chancellor Kent made his will, dated 22d August, 1846. He died on the 12th of December, 1847, leaving his widow, and his son William Kent, and his daughters Mrs. Hone, the plaintiff, and Mrs. Stone, his only heirs at law. A number of the children or grandchildren of his daughters also survived him. He had published five editions

of his celebrated "Commentaries on American Law," and disposed of them, so that none of them remained on hand.

On the 16th of November, 1847, he made three separate contracts with printers, for printing the four volumes of that work, one to print two volumes, and each of the others, one. He also, on the same day, contracted with a paper manufacturer for all the paper for the four volumes. At his death, parts of the 1st, 2d and 4th volumes were printed, but no part of the 3d volume. The four volumes were printed and published in May, 1848; and then the copyright for the 6th edition was taken out by William Kent, in his own name. He sold a considerable part of the edition, and has in his hands, $3,068,77, after paying all expenses, and also some unsold copies of this edition.

The plaintiff claims that this edition passed under the sixth clause of the will. William Kent, who is executor, resists this claim, and insists (though it is against his own interest to do so,) that it passes under the eighth clause.

The counsel for the plaintiff urges that it must be assumed that one so distinguished as the testator, would use language according to its strict meaning, and with great exactness. A young and inexperienced person, probably, studies more the literal meaning of words, than one long accustomed to the interpretation of instruments. The latter is daily compelled to discover the true meaning of others, by examining the whole scope of what they have said or written, and may thus be content in his own writing, if the whole scope of it be clear, without regard to the precision which a student would aim at. That precision, too, is more likely to be found among conveyancers than among either counsel or judges. So in this will, the testator begins by giving to his wife, for life, the use of all his estate, real and personal, and, as if to show that he meant it to be without exception, he declares that his object in this, is to leave her as completely independent in her income as he is; yet, in the next clause, he gives to his son William Kent in fee, nearly all of the farm near the Summit, in New-Jersey, and all the furniture, carriages and moveable property on it. Also, all his books and manuscripts of every kind, constituting his libra-

Hone *v.* Kent.

ry, and his vault. He also gives to his daughter, Mrs. Hone, his pew in Calvary church, and to Mrs. Stone, the rest of the farm in New-Jersey; and in the seventh clause, gives to Mrs. Hone $1,000, as an equivalent for the farm devised to Mrs. Stone. It would be somewhat doubtful whether these gifts were not subject to the widow's life estate. A careful *young* lawyer would probably have anticipated such a doubt, and changed the phraseology so as to prevent it. One more experienced, might be content to see that a fair interpretation of the will would remove any doubt. When the bequests were intended to be subject to the life estate of the widow, the testator so expressed himself, as in the fifth clause, where he gives his daughters a limited choice of the furniture, but "subject to their mother's life estate therein;" and in the eighth clause, where he gives his residuary estate, "subject always to the life estate of my dear wife as aforesaid."

This reference to other parts of the will, is important only, to show that this will is to be interpreted as all others—by the intention as gathered from the whole; and not by the meaning of words, that would result from their derivation.

In the sixth clause the testator gives to his son, William Kent, his Commentaries on American Law, with the right of *renewal* of all previous and future editions, and all other rights and privileges appertaining to the copyright, and to so much of the then existing edition, as may remain unsold at his death. He adds: "but I hereby charge upon this bequest of the copyright, one half, of the net profits arising after my death from the sales thereof, after deducting all expenses of printing and publishing future editions, and all other expenses appertaining to the custody, care and sale of the Commentaries, to be held by my son during the existence of the copyright, for the separate use of Mrs. Hone and Mrs. Stone." He gives the reason for making this disposition, and it aids very much in determining the extent of the gift. It is, that he deems it advisable that his son should have the legal right and title, and exclusive control in his discretion of the copyright, and of the *future* editions thereof, *and of the corrections, additions and improve-*

*ments, to be from time to time made to the said Commenta-
ries,* and as some *compensation* for his *trouble, labor and re-
sponsibility* in respect to *the same,* that he and his legal rep-
resentatives should have to their own use, the remaining half
of the net profits of the *future* editions and sales of the Com-
mentaries.

The testator knew the value of the work which has spread
his name through his native country, and given him a deserved
reputation abroad; he was naturally desirous of preserving
both its high character, and its value as property, and knew
that for this purpose, as successive editions would be called for,
they must conform to the successive changes in the law.   For
this reason he selected an editor whose reputation as a judge,
and as a lawyer, were such as to secure undiminished confidence
on the part of the public, in the accuracy and learning of the
book; and whose close relationship would make him feel his
own fame identified with that of the testator.   He was to have
the exclusive control of the *copyright,* and of the *future* edi-
tions, and of the *corrections, additions and improvements,* to
be from time to time made to the Commentaries : and it was as
some compensation for his trouble, labor and responsibility, in
respect to the same, that he was to have half the net profits.
It follows, then, that where he had not the exclusive control of
an edition, and no control over the corrections, additions and im-
provements to be made to it, and no trouble, labor or responsi-
bility, in respect to those corrections, additions and improve-
ments, he had not earned the compensation allowed for those
peculiar services, and was not to receive it.   In this case, the
testator had made all the corrections, additions and improve-
ments to the edition, and had assumed not only all the trouble,
labor and responsibility, in respect to these services, but the
trouble, labor and pecuniary responsibility, also, of completing
all the contracts for the publication of the 6th edition.   With
the light thus shed by the testator, on his own meaning, it is
not difficult to understand what was intended to be given by
this sixth clause.   But he is his own expositor again; after
making the bequest he says : " I charge upon *this bequest of*

Hone *v.* Kent.

*the copyright* of my Commentaries," showing that all he meant to give was the mere copyright, or the right to the son to *cause to be published*. Here the testator had exercised that right as to the 6th edition : he had *caused* it to be published, so far that the work must be completed, or his estate buy off the contractors to abandon the work which they had commenced.

When in the beginning of this clause, he gives to his son the Commentaries, with the right of renewal of all previous and future editions, it is plain he means to give the bare copyright. The term renewal would be inapplicable to any other right, and is peculiarly appropriate to that right. The addition, " and all other rights and privileges appertaining to the copyright," shows again that the mere copyright was the principal gift, and anything connected with the gift was connected only as an incident to the copyright. The testator, in order to include every possible incident of a copyright, adds " rights and privileges appertaining to the copyright, and *to so much* of the *then* existing *edition* as may remain unsold ;" that is, rights of publication appertaining to that edition. He did not mean to give the books themselves, or any interest or title in the edition existing at his death, (except to republish them) ; for in the eighth, which is the residuary clause, he expressly gives all " unsold Commentaries on hand," to his residuary legatees.

The gift to the son, of the mere copyright, with the statement that the donee was to make corrections, additions and improvements in the work, and was to have the labor, trouble and responsibility in respect to the same, and the express gift to others, of all unsold copies of the work on hand, make it sufficiently clear that this edition, which the testator had himself edited, and contracted to have published, could not be included in the gift to the son. The claim of the plaintiff is as a specific legatee : she must show that this particular property was in contemplation of the testator when he made the will, or within his clear meaning. If that can not be established, she can not take it, but it must pass to his residuary legatees, who take all that is not specifically bequeathed. It is probable that he did not contemplate such a state of

---

things as has occurred; and if his will has not provided for it in this sixth clause, it has in the *general* disposition made in the residuary clause. If the words "unsold volumes on hand," used in the residuary clause, do not include this edition, the words "the residue of my estate, real and personal," do. It is not material, therefore, to inquire whether these unfinished volumes could be called "unsold volumes on hand," or not

The judgment should be reversed, but without costs; and a judgment entered declaring that the net proceeds of this 6th edition, are to pass under the eighth clause of the will.

